J-S22014-20

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

COMMONWEALTH OF PENNSYLVANIA　　:　　IN THE SUPERIOR COURT OF
　　　　　　　　　　　　　　　　:　　　　　PENNSYLVANIA
　　　　　　　　　　　　　　　　:
　　　　　v.　　　　　　　　　　:
　　　　　　　　　　　　　　　　:
　　　　　　　　　　　　　　　　:
TORRENCE JUDE MCCARTHY　　　　　:
　　　　　　　　　　　　　　　　:
　　　　　Appellant　　　　　　　:　　No. 1259 MDA 2019

Appeal from the PCRA Order Entered July 1, 2019
In the Court of Common Pleas of Dauphin County Criminal Division at
No(s): CP-22-CR-0004216-2005

BEFORE:　　OLSON, J., MURRAY, J., and COLINS, J.[*]

MEMORANDUM BY OLSON, J.:　　　　　**FILED: JUNE 8, 2020**

Appellant, Torrence Jude McCarthy, appeals from the order entered on July 1, 2019, dismissing his first petition filed pursuant to the Post Conviction Relief Act (PCRA), 42 Pa.C.S.A. 9541-9546. Upon review, we affirm.

A prior panel of this Court briefly summarized the facts of this case as follows:

> In the case *sub judice*, the Commonwealth presented the testimony of a number of witnesses, including Derick Brice, who detailed the events and circumstances surrounding the May 27, 2005 shooting of [Jared] Enos. Brice explained that, after taking a bus from Philadelphia to Harrisburg on the day in question, he was picked up at the bus station by Mays, who was driving a green Kia Sportage, and Appellant. On their way to the apartment that Brice and his mother shared, the men saw Enos. Upon observing Enos, Appellant remarked, "There goes the pussy right there." Brice explained that, during the time in question, there existed discord between two groups of individuals; one group consisted of Appellant and Mays, and the other consisted of Enos and some of

---

[*] Retired Senior Judge assigned to the Superior Court.

his friends. Appellant allegedly informed Brice that one (1) or two (2) weeks prior, Enos or one (1) of his colleagues had fired gunshots into the Kia.

Brice testified that, in response to Appellant's comment regarding Enos, Brice stated, "Let's keep going." When questioned by Commonwealth counsel as to why he uttered this statement, Brice explained, "Because I knew it was a beef, and I knew we could have been in danger at that point in time."

The men arrived at Brice's apartment, at which time Brice spoke to his mother, dropped his bag off, and left in her Chrysler Concord. He proceeded to a service station and was followed by Appellant and Mays, who had remained in the Kia. Following a stop at a Wendy's restaurant, the three (3) men went to the apartment building of Appellant and Mays, where Mays parked the Kia. Mays entered Appellant's vehicle and sat in the front passenger seat, and Appellant entered approximately two (2) to three (3) minutes later and sat in the rear passenger seat.

Brice testified that when Appellant entered the vehicle, he stated, "Let's go around the block. I want to see something." Brice proceeded around the block onto Briggs Street with his headlights turned off until Mays tapped his hand and stated, "Hold up." Brice brought the vehicle to a stop near a group of people on the street, at which time Appellant fired a number of gunshots out the rear passenger window. Brice sped away from the scene and was directed to an alleyway by Appellant. Appellant exited the vehicle and returned one (1) to two (2) minutes later. As Brice drove the men away from the area toward his and his mother's apartment, Appellant stated, "I hope I hit one of the motherfuckers. I hope I hit one of the motherfuckers." After passing an ambulance, Brice uttered, "Somebody hit, somebody got hit back there."

The Commonwealth also presented the testimony of Linn Mosley, Jr., who resided on Briggs Street during the time in question and testified as to circumstances surrounding the shooting of Enos. Mosley stated that earlier on the evening of May 27, 2005, he heard a verbal exchange between Cameron Howard, Mays, and Appellant on Briggs Street. Howard was speaking to Mays, who was seated in the driver's seat of the Kia Sportage, and Appellant, who was seated in the front passenger's seat. Mosley heard Howard tell the men, "Cut the beef out, end what's going on." Howard added that Enos was returning to the area and wanted to

talk. One of the vehicle's occupants replied, "Fuck that. We'll be back."

At approximately 11:30 p.m. that evening, Mosley was on the porch of his home on Briggs Street, and Enos and two (2) men were standing in the street. Mosley observed a vehicle slowly coasting down the street with its headlights off. Fearing that something was going to transpire, Mosley yelled, "Get down." He then heard three (3) to five (5) gunshots fired from what he described as a blue Intrepid or Concord. At the time, he observed "fire" coming from a gun on the passenger side of the vehicle. The vehicle sped through a stop sign and out of sight.

Harrisburg Police Officer Tyron Meik responded to the scene of the shooting and found Enos lying on the ground and unresponsive. Enos was transported by ambulance to a hospital, where he died several days later. Dr. Wayne Ross performed an autopsy on the body of Enos and determined that the cause of death was a gunshot wound to the head.

Detective Brandon Kunkel of the Harrisburg City Police Forensic Technology and Identification Unit testified that testing was conducted on a handgun recovered from a "brushy area" near the crime scene. The handgun was found inside a blue glove. Jeffrey Zachetti, a forensic DNA analyst with the Pennsylvania State Police, stated that a DNA match was made with DNA found on the glove with a blood sample from Appellant.

*Commonwealth v. McCarthy*, 970 A.2d 472 (Pa. Super. 2009) (unpublished memorandum) (internal footnotes and record citations omitted).

Local police, working in conjunction with the U.S. Marshall Service, later apprehended Appellant and Mays together in Tampa, Florida in July 2005. The men were attempting to obtain money wired anonymously to a check cashing service provider. The arresting officer described the appearance of Appellant and Mays as "unkept, soiled[,]" and "[b]asically like [men] who ha[d] been living on the run." The officer further testified that Appellant told Mays not to say anything. *See* N.T., 8/9/2006, at 140-145.

In August 2006, following a joint trial with co-defendant Mays, a jury convicted Appellant of first-degree murder, criminal conspiracy, carrying a firearm without a license, and four counts of recklessly endangering another person.[1] On August 21, 2006, the trial court sentenced Appellant to a term of life imprisonment for first-degree murder and concurrent one to two year terms of incarceration on each of the remaining six convictions. Appellant did not file a direct appeal. On May 23, 2007, Appellant filed a PCRA petition and the trial court reinstated Appellant's right to file a direct appeal *nunc pro tunc*. On January 31, 2008, Appellant filed a notice of appeal *nunc pro tunc*. We affirmed Appellant's judgment of sentence on February 20, 2009. **See Commonwealth v. McCarthy**, 970 A.2d 472 (Pa. Super. 2009) (unpublished memorandum). Our Supreme Court denied further review on September 16, 2009. **See Commonwealth v. McCarthy**, 980 A.2d 606 (Pa. 2009).

On December 15, 2010, Appellant filed a *pro se* PCRA petition. Thereafter, the PCRA court granted Appellant multiple continuances to obtain counsel. Appellant retained private counsel who filed an amended PCRA petition on December 19, 2018. On February 21, 2019, the PCRA court held an evidentiary hearing. Appellant and the Commonwealth subsequently filed supporting briefs with the PCRA court. On July 1, 2019, the PCRA court filed

---

[1] 18 Pa.C.S.A. §§ 2501, 903, 6106, and 2705, respectively.

an order and accompanying opinion dismissing Appellant's amended PCRA petition and denying Appellant relief. This timely appeal resulted.[2]

On appeal, Appellant presents the following issues[3] for our review:

1. Did the PCRA court err with respect to the City Gas and Diesel tapes and the ineffectiveness claims related thereto?

2. Did the [PCRA] court err by denying Appellant's claim that prior counsel should have impeached Brice with [cellular telephone] records?

3. Did the [PCRA] court err by denying Appellant's claim that prior counsel was ineffective for introducing evidence of Appellant's prior bad acts by way of an arraignment sheet for an unrelated criminal matter?

4. Did the [PCRA] court err by denying Appellant's claim that prior counsel was ineffective for failing to object to the Commonwealth's impeachment of one witness with another witness's statement, where that statement was consistent and not admitted as substantive evidence?

Appellant's Brief at 2.

_____

[2] Appellant filed a notice of appeal on July 26, 2019. On July 31, 2019, the PCRA court directed Appellant to file a concise statement of errors complained of on appeal pursuant to Pa.R.A.P 1925(b). Appellant complied timely. On August 28, 2019, the PCRA court filed an opinion pursuant to Pa.R.A.P. 1925(a), relying upon its earlier decision entered on July 1, 2009.

[3] Appellant presented three additional claims in his amended PCRA petition that he withdrew at the PCRA hearing. *See* PCRA Court Opinion, 7/1/2019, at 4 n.1. He does not present those issues on appeal. Moreover, Appellant presented another ineffective assistance claim pertaining to jury issues in his Rule 1925(b) statement. The trial court addressed that issue in its Rule 1925(a) opinion. Appellant, however, has neither presented nor developed that claim on appeal and, therefore, we find it waived. *See Commonwealth v. Heggins*, 809 A.2d 908, 912 (Pa. Super. 2002) ("an issue identified on appeal but not developed in the appellant's brief is abandoned and, therefore, waived").

All four of Appellant's claims challenge the effectiveness of counsel's performance at trial. Accordingly, we employ the following standard of review:

> Our standard of review from the denial of post-conviction relief is limited to examining whether the PCRA court's determination is supported by the evidence of record and whether it is free of legal error.
>
> *                *                *
>
> A PCRA petitioner will only prevail on a claim that trial counsel was ineffective through pleading and proving each of the following: (1) the underlying legal claim is of arguable merit; (2) counsel's action or inaction lacked any objectively reasonable basis designed to effectuate his client's interest; and (3) prejudice, to the effect that there was a reasonable probability of a different outcome if not for counsel's error. A failure to plead or prove any prong will defeat an ineffectiveness claim. Further:
>
>> A PCRA petitioner will be granted relief only when he proves, by a preponderance of the evidence, that his conviction or sentence resulted from the ineffective assistance of counsel which, in the circumstances of the particular case, so undermined the truth determining process that no reliable adjudication of guilt or innocence could have taken place.
>
> Counsel is presumed to be effective and the burden of demonstrating ineffectiveness rests on [the] appellant. Additionally, counsel is not ineffective for failing to raise a claim that is devoid of merit.

*Commonwealth v. Ligon*, 206 A.3d 515, 519 (Pa. Super. 2019) (internal citations, quotations, and original brackets omitted).

In his first claim presented, Appellant asserts that trial counsel was ineffective for failing to procure video surveillance from a gas station called City Gas and Diesel.[4]  Appellant's Brief at 22-32.  More specifically, he claims:

Detective [Victor] Rivera memorialized in his investigative report that he collected surveillance tapes from City Gas and Diesel. Appellant maintains that this footage would have shown him present at that location at a time which would have made it impossible for him to have participated in the instant homicide. Nevertheless, at trial, Detective Rivera claimed that he never collected the footage.  These circumstances are indicative of either a **Brady**[5] violation that went unobjected to by trial counsel; or an instance of trial counsel's ineffectiveness for failing to impeach Detective Rivera with his own report.

*Id.* at 22-23.

Our Supreme Court previously determined:

To demonstrate a **Brady** violation, Appellant must show that: (1) the prosecution concealed evidence; (2) which was either exculpatory evidence or impeachment evidence favorable to him; and (3) he was prejudiced by the concealment.  To show prejudice, he must demonstrate a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.  A reasonable probability

---

[4]  We note that, at trial, the court admitted surveillance video from an Exxon gas station offered by the Commonwealth.  At trial, Appellant testified that he left the Exxon station with Mays and Brice and the three men went to an apartment Appellant shared with Mays.  Appellant testified that the three men subsequently went to the City Gas and Diesel in Brice's blue car.  At City Gas and Diesel, Appellant claimed he got out of Brice's car and into another vehicle that was white.   Thus, Appellant asserts that City Gas and Diesel surveillance video would have discredited Brice's testimony that Appellant was present at the scene of the murder.  Appellant's Brief at 29.

[5] **Brady v. Maryland**, 373 U.S. 83 (1963) (U.S. Supreme Court held that a defendant has a federal constitutional right to receive material exculpatory evidence in the possession of the prosecution).

for these purposes is one which undermines confidence in the outcome of the trial.

Furthermore, [] ***Brady*** evidence may not be cumulative of other evidence, cannot have been equally available to the defense, and cannot have been discoverable through the exercise of reasonable diligence.

***Commonwealth v. Simpson***, 66 A.3d 253, 264 (Pa. 2013) (internal citations and quotations omitted). Moreover, "[t]he withheld evidence must have been in the exclusive control of the prosecution at the time of trial."

***Commonwealth v. Haskins***, 60 A.3d 538, 547 (Pa. Super. 2012).

In this case, the PCRA court determined:

[Appellant] proffered that the video in question would show [Appellant], Brice, and Mays in Brice's blue car on May 27, 2005, between approximately 11:15 [p.m.] and 11:30 p.m., and would also show Mays entering the convenience store at City Gas and Diesel, and then show the men leaving westward towards 15th Street. [Appellant] claims he would use it to contradict Brice's trial testimony. Surveillance video from an Exxon gas station was played to the jury showing the men at that Exxon station at 11:07 p.m., and the evidence then established that they had traveled to Wendy's, not another gas station (*i.e.*, City Gas and Diesel).

At the PCRA hearing, [Appellant] testified that after leaving the Exxon station, the three men went to May's apartment and then to City Gas and Diesel to pick up a tobacco product that the Exxon station did not carry. He stated from there he got out of Brice's car and into a white Ford, drove around for a bit, went back to City Gas and Diesel to get gas, and drove the white car back to its owner in West Hanover Township (mid-Eastern area of Dauphin County). This is contrary to Brice's trial testimony that the men went from the Exxon to May's apartment to Briggs Street.

[Trial counsel,] Attorney [Paul J.] Kovatch also testified at the PCRA hearing. He stated that his trial strategy was to elicit evidence to show that Brice was the shooter, not [Appellant]. When asked about the City Gas and Diesel video, Attorney Kovatch recalled a discussion with [Appellant] about it. When asked if he requested that video prior to trial, Attorney Kovatch

- 8 -

said he believed he did. He recalls sending an investigator to speak with whoever was in charge of the video at the time, but also testified that there was a very good chance that he was confusing it with the Exxon video. Attorney Kovatch was asked if he recalled testimony from Detective Rivera that he asked for tapes from City Gas and Diesel but there were none. He was also asked why he did not object to Detective Rivera's trial testimony that Detective Rivera stated there was no video from City Gas and Diesel even though it was indicated in his report. Attorney Kovatch responded that if the detective was testifying to evidence [the defense did not] have, then he obviously would have made an objection to it, but he couldn't recall the video issue and whether they had it or did not have it.

In light of the foregoing, [the trial court determined Appellant] failed to prove the actual existence of the City Gas and Diesel video. Assuming there [was] such a video, it was equally accessible to [Appellant], as he could have obtained his own copy from the gas station. [Appellant] has also failed to prove that such video was in the Commonwealth's possession, as the detective testified at trial that he did not obtain video from the gas station. In light of these circumstances, there was clearly no *Brady* violation. Additionally, even assuming the existence of the City Gas and Diesel video, the trial record shows that such evidence would not compel a different verdict, given the overwhelming nature of evidence supporting [Appellant's] conviction. Even if there were arguable merit and no reasonable basis for counsel's alleged failure to demand production of the alleged City Gas and Diesel video, there was no prejudice to [Appellant].

PCRA Court Opinion, 7/1/2019, at 6-7 (record citations and footnote omitted).

Upon review, we agree with the PCRA court's assessment. Under the PCRA, Appellant has the duty to plead and prove his entitlement to relief and he has not done so. There is simply no evidence of exculpatory surveillance video from City Gas and Diesel as Appellant has baldly alleged. Since there is no proof of the purported surveillance tape, it could not be in the exclusive control of the Commonwealth. Hence, there was no violation of the rule

- 9 -

established in **Brady**. Moreover, while Detective Rivera's testimony and investigative report about the existence of a City Gas and Diesel surveillance tape appear contradictory, Appellant has not demonstrated prejudice for failing to cross-examine the detective on the issue, in an effort to impeach his credibility. Appellant has not shown that there was a reasonable probability that the result of the proceeding would have been different. Here, as we previously noted on direct appeal, and as Appellant currently concedes, police recovered the murder weapon the day after the crime, near the crime scene, and wrapped in a glove containing Appellant's DNA. **See** Appellant's Brief at 8. Thus, even assuming that Appellant was at City Gas and Diesel **before** the murder as he alleged, the physical evidence shows his presence at the scene and belies his claim that the proffered, but unsubstantiated, surveillance video was exculpatory. Accordingly, there is no merit to Appellant's first claim of trial counsel ineffectiveness.

Next, Appellant claims that trial counsel was ineffective for failing to "impeach Brice with [Appellant's cellular telephone] records, which contradicted [Brice's] trial testimony that after the shooting, Appellant was repeatedly calling his voicemail."[6] Appellant's Brief at 32. Appellant claims

---

[6] More specifically, Appellant contends:

> Brice testified that following the shooting, they went back to his apartment, where Appellant refused to answer phone calls, played voicemail messages left by police, and made several phone calls.

- 10 -

the PCRA court erred by finding such proffered evidence constituted a collateral matter to the central issue at trial, the identity of the shooter. ***Id.*** at 32-33. Appellant posits:

> Whether Appellant was avoiding [tele]phone calls from law enforcement immediately after the shooting had a direct bearing on his guilt or innocence because it was one of the few pieces of evidence that went toward his intent that night. As such, it was material whether Appellant was with Brice after the shooting, because that would tend to show whether he was with Brice during the shooting and if immediately after the shooting he was acting in a manner consistent with guilt.

***Id.*** at 34.

> On this issue, the PCRA court determined:
>
> Whether or not [Appellant] answered his phone after shooting Enos is collateral to the central issue of the actual identity of the shooter. Attorney Kovatch testified at the PCRA hearing that he impeached Brice on many of his inconsistencies, including that Brice admitted to lying in his first statement [to police]. [Attorney Kovatch] agreed that Brice's credibility was a [significant] issue in his case. Attorney Kovatch testified that he did not recall having [Appellant's telephone] records before trial, but if he had them and did not introduce them, it would have been "some sort of

_____

> Brice testified that Appellant left his apartment around 1 or 2 a.m. However, Appellant's cellphone records, that were introduced at the evidentiary in this matter, show that between 11:42 p.m. and 1:43 a.m.[,] Appellant answered [nine] incoming calls and made [three] outgoing calls, and further indicate that Appellant did not check his voicemail messages until 3:48 a.m. This is directly contrary to Brice's trial testimony, and does not serve merely to impeach him, but tends to exculpate Appellant and disproves Brice's version of events. Whether Appellant was avoiding phone calls from law enforcement immediately after the shooting had a direct bearing on his guilt or innocence because it was one of the few pieces of evidence that went toward his intent that night.

Appellant's Brief at 34 (record citations omitted).

- 11 -

strategy regarding the numbers themselves....[and] we didn't want to introduce the calls that were coming in because it may have had other consequences in the trial." [N.T. PCRA Hearing, 2/21/2019, at 16]. Given the fact that Brice's credibility had already been impeached, along with the overwhelming evidence against [Appellant], [the PCRA court found] this claim of ineffective assistance [] without merit.

PCRA Court Opinion, 7/1/2019, at 8-9.

Upon review, we agree that Appellant is not entitled to relief on his claim that trial counsel was ineffective for failing to impeach Brice with Appellant's cellular telephone records. Again, Appellant has failed to show that the outcome of trial would have been different if trial counsel had taken the suggested course of action. Hence, Appellant has not shown that he was prejudiced. The record shows that Appellant fled with co-defendant Mays. Appellant concedes, and the record clearly shows, that police apprehended both men together in Tampa, Florida months after Enos' shooting and that they appeared "unkept," "soiled," and "[likely to] be on the run." ***See*** Appellant's Brief at 9; ***see also*** N.T., 8/9/2006, at 140-145. Such evidence overwhelmingly supported an inference of Appellant's consciousness of guilt, separate and apart from additional confrontation of Brice with Appellant's cellular telephone records. ***See Commonwealth v. Laird***, 988 A.2d 618, 627 (Pa. 2010) (indicating that flight and concealment can constitute circumstantial proof of consciousness of guilt). Accordingly, Appellant is not entitled to relief on his second claim.

In his third issue presented on appeal, Appellant claims that trial counsel was ineffective in eliciting certain prior bad acts testimony from Detective Rivera, the lead investigator in Pennsylvania. Appellant's Brief at 36-38. The premise of Appellant's claim is that trial counsel contravened Pa.R.E. 404(b). More specifically, Appellant contends that trial counsel improperly elicited trial testimony[7] from the investigating detective regarding an arraignment sheet recovered from Appellant's apartment approximately one month after the shooting but before apprehending Appellant in Florida. The document directed Appellant to appear for a scheduled, criminal proceeding in an unrelated matter. *Id.* Although Appellant does not question counsel's strategy in using the document to establish Appellant's presence at a particular location at a particular time, Appellant nonetheless claims that trial counsel "should have sought to redact the arraignment sheet, to merely indicate Appellant had a

_____

[7] We note that this case presents a somewhat novel ineffective assistance of counsel claim. Generally, ineffective assistance claims are raised where prior bad acts evidence subject to challenge under Pa.R.E. 404(b) has been admitted at trial without objection from defense counsel. As such, the cases examining ineffective assistance claims pertaining to Rule 404(b) consist primarily of claims that trial counsel improperly failed to object to efforts by the Commonwealth to introduce prior bad act evidence or that counsel failed to request a limiting jury instruction. Here, Appellant does not argue that the Commonwealth improperly introduced Rule 404(b) evidence. He claims instead that trial counsel affirmatively offered prior acts evidence that was subject to exclusion under Rule 404(b). Despite the unconventional nature of Appellant's claim, however, as discussed at length below, our Supreme Court has determined that a PCRA petitioner asserting ineffective assistance always carries the burden to show that trial counsel's chosen course of action had no reasonable basis designed to effectuate his client's interests. ***See Commonwealth v. Chmiel***, 889 A.2d 501 (Pa. 2005), *citing* Pa.R.E. 404(b).

court date of an undisclosed nature" and that such failure prejudiced him because "he lost the presumption of innocence when the jury heard he had other unrelated criminal charges." *Id.* at 38. Accordingly, Appellant posits the PCRA court erred by "holding that the reference was 'at most, a fleeting reference to criminal activity,' and that such an incident did not prejudice Appellant." *Id.* at 36.

Our Supreme Court has held:

Evidence of prior bad acts is inadmissible to prove character or to show conduct in conformity with that character. ***Commonwealth v. Busanet***, 54 A.3d 35, 60 (Pa. 2012); ***Commonwealth v. Sherwood***, 982 A.2d 483, 497 (Pa. 2009); Pa.R.E. 404(a)(1). Such evidence is, however, admissible when offered to prove some other relevant fact, such as motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. ***Commonwealth v. Chmiel***, 889 A.2d 501, 534 (Pa. 2005); Pa.R.E. 404(b)(2).

[Our Supreme Court has] also recognized that prior bad acts evidence may be admissible as *res gestae* when relevant to furnish the complete story or context of events surrounding the crime. ***See Commonwealth v. Williams***, 896 A.2d 523, 539 (Pa. 2006) ("[The Pennsylvania Supreme] Court has recognized exceptions to Rule 404, for which evidence of other crimes may be introduced, including the *res gestae* exception which allows 'the complete story' to be told." (*citing* ***Commonwealth v. Paddy***, 800 A.2d 294, 308 (Pa. 2002))); ***Commonwealth v. Lark***, 543 A.2d 491, 497 (Pa. 1988) ("evidence of other crimes may be relevant and admissible [ ] where such evidence was part of the chain or sequence of events which became part of the history of the case and formed part of the natural development of the facts."). ***See also Commonwealth v. Spruill***, 391 A.2d 1048, 1050 (Pa. 1978) (recognizing that there are exceptions to the rule that reference to prior bad acts is error "where there is a legitimate basis for the introduction of the evidence other than a mere attempt to establish the accused's predisposition to commit the crime charged.").

However, while evidence of prior bad acts may be relevant and admissible, there is the "potential for misunderstanding on the part of the jury when this type of evidence is admitted." ***Commonwealth v. Claypool***, 495 A.2d 176, 179 (Pa. 1985). This evidence must, therefore, "be accompanied by a cautionary instruction which fully and carefully explains to the jury the limited purpose for which that evidence has been admitted." ***Id.*** In the context of an ineffectiveness claim, counsel's failure to request a cautionary instruction regarding evidence of other crimes or prior bad acts does not constitute *per se* ineffectiveness; "[r]ather, in order to obtain relief under such a claim, a defendant must still satisfy each of the three prongs of the test for ineffective assistance of counsel." ***Commonwealth v. Buehl***, 658 A.2d 771, 778 (Pa. 1995) (plurality). With regard to the reasonable basis prong of this test, it is incumbent on the petitioner to demonstrate that counsel's chosen course of action had no reasonable basis designed to effectuate his client's interests. ***See***, ***e.g.***, ***Chmiel***, 889 A.2d at 547 (holding that based on trial counsel's PCRA testimony, counsel had a reasonable basis for declining to request a limiting instruction). When the petitioner is granted a PCRA hearing, it is his burden to satisfy this aspect of the test with direct questioning of trial counsel. ***See Commonwealth v. Koehler***, 36 A.3d 121, 146 (Pa. 2012) (faulting a PCRA petitioner for declining to question trial counsel at the PCRA hearing about the lack of a strategic basis for failing to object).

***Commonwealth v. Weiss***, 81 A.3d 767, 798–799 (Pa. 2013).

The PCRA court concluded:

At the PCRA hearing, it was [trial counsel's] recollection that the arraignment sheet was introduced to show [Appellant's] presence in [Harrisburg] at the time, and that [Appellant] did appear for court. [Trial counsel] also testified that there was no reference to the underlying charge itself.

\*          \*          \*

Here, the claimed error was, at most, a fleeting reference to criminal activity. The line of questioning at issue had nothing to do with [Appellant's] criminal history. There is simply nothing in this isolated incident at trial that was so prejudicial as to require a new trial. It follows that [trial counsel] did not render ineffective assistance to [Appellant].

- 15 -

PCRA Court Opinion, 7/1/2019, at 9.

Finally, in his brief to this Court, Appellant admits:

Here, despite the Commonwealth's contention that Appellant fled following the shooting, there was evidence that investigating detectives knew Appellant had a court date for another matter in the jurisdiction approximately a month after the shooting, *via* an arraignment sheet recovered from his apartment. Appellant ultimately returned to the jurisdiction to attend this court date. Appellant's return to the jurisdiction tends to negate the Commonwealth's evidence of flight as consciousness of guilt.

Appellant's Brief at 37.

Taken all together and upon review of the certified record, we conclude that the PCRA court did not err in denying Appellant relief on his ineffective assistance of counsel claim related to Rule 404(b). Here, evidence that police recovered an unrelated criminal arraignment document from Appellant's apartment was part of the chain or sequence of events which became part of the history of the case and formed part of the natural facts under the *res gestae* exception to Rule 404(b). Detective Rivera testified regarding his general investigation efforts in this case. He testified that once he recovered an arraignment sheet from Appellant's apartment, he knew that Appellant was required to appear for court on a certain date, so Detective Rivera sent officers to the Dauphin County Courthouse to look for Appellant on that day. N.T., 8/10/2006, at 145-146. Moreover, the brief reference did not mention particular criminal charges pending against Appellant. Obviously, trial counsel did not seek to establish Appellant's predisposition to commit crime by eliciting testimony regarding Appellant's presence at the unrelated arraignment.

Instead, trial counsel offered the arraignment form to establish Appellant's presence in Harrisburg, Pennsylvania after the shooting, but before his apprehension in Florida, in order to negate the Commonwealth's evidence of flight as consciousness of Appellant's guilt. As such, counsel had a legitimate basis for the introduction of the evidence, as well as a reasonable strategy for eliciting testimony regarding Appellant's unrelated criminal proceeding. For these reasons, Appellant is not entitled to relief on his third issue.[8]

Finally, Appellant claims that trial counsel was ineffective for "failing to object to the Commonwealth's impeachment of one witness with another witness's statement[.]" Appellant's Brief at 2. To provide context, Appellant explains:

> In the instant matter, [Commonwealth witness, Cameron] Howard told police that after he told [Mays and Appellant] to talk to [Enos] and to work their problems out, there was no response from [Mays and Appellant] inside the car. This was consistent with [Mr. Howard's] trial testimony. N.T., 8/9/2006 at 30-34. However, the Commonwealth impeached Mr. Howard with a statement that Linn [Mosely, Jr.] gave to police when [the Commonwealth] asked Mr. Howard, "When you told [Appellant] and Jeffrey Mays, Hey, you need to talk to [Enos] you need to squash this beef, you need to end this beef, they responded by saying, Fuck that. We'll be back. Isn't that true?" *See* N.T., 8/9/2006 at 33-34, 34-35. Mr.

_____

[8] We note that upon review of the certified record, the trial court's jury instructions were not transcribed. As a result, we cannot verify whether the trial court gave a cautionary instruction that fully and carefully explained to the jury the limited purpose for the admission of that evidence. Nor can we verify whether trial counsel requested one. Ostensibly, trial counsel would not wish to highlight the brief admission of the prior act evidence. However, in light of our discussion that trial counsel's strategy was reasonable and the fact that Appellant does not challenge trial counsel's stewardship regarding jury instructions, we need not review the instructions of the court.

Howard denied hearing that response from [Appellant] and testified consistent with his prior statement that he got no response from [Mays or Appellant]. *Id.* Mr. Howard never said, at any point, that [Mays or Appellant] said 'Fuck that. We'll be back.' - this was never Mr. Howard's statement for him to be impeached with. [Trial counsel] did not object to this improper impeachment.

*Id.* at 40-41.

Accordingly, Appellant asserts:

the [PCRA] court abused its discretion when it held Appellant's prior counsel was not ineffective for failing to object to Linn[ Mosely, Jr.'s] inadmissible hearsay statement. When [Cameron] Howard was impeached with [Mosely's] statement, [Mosely] had not testified yet and his statement was not admissible for anything. And, ultimately, [Mosely]'s testimony regarding the events earlier in the day was not inconsistent with his prior statement, and thus not admissible as substantive evidence. Thus, [Mosely's] statement was not proper impeachment material for [] Howard, and served no purpose but to impermissibly bolster [Mosely's] credibility and the Commonwealth's theory of the case.

*Id.* at 20-21.

In support of his proposition, Appellant relies upon ***Commonwealth v. Baez***, 431 A.2d 909 (Pa. 1981), wherein our Supreme Court determined:

The credibility of a witness may be impeached (1) by showing that on a prior occasion he made a statement, either oral or written, that is inconsistent with his present testimony; (2) by competent evidence tending to show bias, bad character for truth and honesty, or defects in memory, perception or capacity or (3) by the competent contradictory testimony of other witnesses whose version of the facts differs from that of the witness being impeached; ***Commonwealth v. Hamm***, 378 A.2d 1219 (Pa. 1976); McCormick, Evidence, s 33 at 66 (2d ed. 1972).

\*　　　　\*　　　　\*

[I]f contradictory testimony is not competent to be introduced as substantive evidence, then it equally cannot be used for

impeachment purposes. ***See Commonwealth v. Noble***, 88 A.2d 760 (Pa. 1952).

***Baez***, 431 A.2d at 912.

The following testimony was elicited at trial. Although Mosely testified after Howard at trial,[9] Mosely stated that, on the day in question, he saw Mays and Appellant together in a car speaking with Howard several hours before the murder. N.T., 8/9/2006, at 77. Thereafter, the Commonwealth engaged in the following exchange with Mosely:

Q: What did you hear Cameron Howard tell Jeffrey Mays and [Appellant]?

A: Cut the beef out, end what's going on. He was just along the lines of telling [them] to end whatever was going on. He told them [Enos] was coming back and they wanted to talk.

Q: Cameron Howard wanted them to talk?

A: Yes.

Q: Did you hear any [response from inside car]?

A: I heard, Fuck that. We'll be back.

Q: Do you know who said that?

A: No. I know it came out of the vehicle.

Q: Other than the two defendants, did you see anyone else in the vehicle?

A: No, I didn't.

Q: Again, how far away are you from the vehicle?

A: Not a full 25, 30 feet.

---

[9] Certainly, the Commonwealth could have recalled Howard after Mosely testified, subject to the trial court's approval. ***See Commonwealth v. Crosby***, 297 A.2d 114, 116–117 (Pa. 1972).

*Id.* at 78.

On cross-examination, the following exchange occurred between trial counsel and Mosely:

Q: Now you are testifying here today that you could or could not overhear the conversation between Cameron Howard and Jeffrey Mays?

A: That I could or couldn't?

Q: Are you testifying today that you could or couldn't?

A: When you say as in could, you mean specific details; or when you say as I heard the conversation cut the beef, cut it out, you all need to end this and all of that?

Q: But you have no idea really what the conversation was about, right? Correct? You don't know what they were talking about really, right?

A: Until I heard Cameron tell [Mays] that [Enos] was coming back, and I heard, Fuck that. We'll be back.

*Id.* at 127.

The PCRA court ultimately concluded:

[T]he statement from Mosely was introduced as substantive evidence at trial, Mosely testified consistently at trial with the statement given to police – with which Howard was impeached. Thus, as Mosely's contradictory testimony was introduced as substantive evidence, the Commonwealth properly used it to impeach Howard. […] Moreover, any error in this regard would be considered harmless, given the evidence against [Appellant].

PCRA Court Opinion, 7/1/2019, at 11.

We agree with the PCRA court. Here, there were two trial witnesses who offered different versions of events. Mosely's testimony was eventually admitted as substantive evidence but only after the presentation of Howard's

testimony. Because Mosely's testimony contradicted Howard's version of events, Mosely's testimony was properly used to impeach Howard. Although the order in which the witnesses testified was perhaps unconventional, we see no departure from the methods of impeachment approved by prior case law. Moreover, Appellant has not demonstrated prejudice considering the other evidence presented, including Brice's testimony, Appellant's DNA evidence, and Appellant's subsequent flight and concealment. Appellant is not entitled to relief on this last claim.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 06/08/2020